84     COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,          Washington, ex'r, vs. Burnett.          1870.

# Wheeling.

RICHARD B. WASHINGTON, EX'R, vs. ANN J. BURNETT.

January Term, 1870.

1. Where a payment on a bond is made in confederate money, so-called, and received, without fraud or misrepresentation, both parties having full knowledge of the article paid and received, it is an executed contract, and the courts will not interfere to aid one party more than the other.

2. It is not error where the contents of a release, pleaded but not offered in evidence, are proved by parol evidence, if no objection is offered to such mode of proof.

This was an action of debt brought to February rules, 1868, in the circuit court of Jefferson county, by Richard B. Washington, executor of John A. Washington, against Ann J. Burnett. The defendant pleaded payment, and a release of the bond sued on, by a certain writing sealed with the seal of the plaintiff. At the June term, 1868, a trial was had and verdict for the defendant; verdict set aside on motion of the plaintiff and new trial granted. At the December term a second trial was had and another verdict for the defendant which the court refused to set aside, and the plaintiff excepted and the evidence was certified.

The first bill of exceptions showed that after the plaintiff had introduced the bond sued on, that the defendant introduced evidence tending to prove the payment of the bond, and that at the time thereof the bond was not in the plaintiff's possession, but he executed a receipt in full for the same, and promised as soon as he could get the bond, which was in the hands of bankers at Alexandria, Virginia, that

he would surrender it to the defendant; whereupon the plaintiff offered evidence tending to prove that upwards of 1400 dollars of the amount due on the bond was paid in confederate money, and an order on the confederate government. The plaintiff then asked the court to instruct the jury, that if any part of the payment made on the bond was paid in confederate money, or in orders on the confederate government, that such payments must be disregarded, and verdict must be rendered for the balance due after deducting all payments not proved to have been made in confederate money, and orders as above mentioned. Which instruction the court refused, and instructed as follows:

"If the jury believe from the evidence that the plaintiff and defendant accounted together as to the indebtedness evidenced by the bond sued on, and so accounted freely and without concealment or fraud by either, and that as a result the bond was so paid and discharged as that the defendant was then entitled to said bond, then it is not material to enquire into the consideration so paid and accepted in the discharge thereof; but if they believe from the evidence that the transaction was not so executed, final and conclusive, that the defendant was then and there entitled of right to said bond, then all pretended payments claimed which are shown to have been paid in confederate money, or other illegal or unlawful currency, are null and void, and should be totally disregarded by the jury." To which refusal and subsequent instruction the plaintiff excepted.

The facts proved were fully set out, by which it appeared that, 500 dollars were paid on the bond in 1857; 1200 dollars in 1859; and 500 dollars in 1861; which payments were not controverted, and were made to the plaintiff's testator; that 785 dollars were paid by a check on the confederate government in 1862; also 700 dollars in confederate money in 1862; in January, 1863, the balance due on the bond was 1453 dollars and 17 cents, which was paid by 303 bushels of wheat at 2 dollars per bushel, and the residue, 847 dollars and 17 cents, in confederate money. Parol evidence was

also given to prove the execution of a release of the deed of trust given to secure the payment of the bond, but the deed itself was not offered in evidence.

The plaintiff obtained a supersedeas from this court.

*Stanton & Allison* and *Kennedy*, for the plaintiff in error.

*Faulkner* for the defendant in error.

The payments made by the appellee in confederate treasury notes, and voluntarily received by the appellant in part discharge of the bonds due to his testator, were payments made in good faith, in the settlement of an ordinary private transaction, and with no purpose or intention to aid or encourage the rebellion. These payments were made some seven or eight years ago, at a time when these notes were the exclusive currency in that section of this State, when they had a fixed and ascertained value in the community, when they were received in all the ordinary transactions of business at their par value, and no one, who at that time received them, can complain that he could not purchase any commodity with them at a fair price, or use them in the discharge of his debts. They constituted the exclusive medium of exchange amongst many millions of people, and without their use, no man could obtain the ordinary means of living.

These notes were issued by a government that at the time exercised supreme power over some ten States, sustained in all its acts by a military power which could not be resisted within its own limits of authority, leaving to the inhabitants no alternative but to receive them, or to perish for the want of the ordinary supplies of life. Chief Justice Chase, in the case of *Kepple* v. *Petersburg Railroad*, presents, with great truth, the circumstances under which these notes acquired circulation. "This currency may fairly be said to have been impressed on the country by irresistible force. There was no other in which the current transactions of business could be carried on; and there could be no other,

while the rebel government kept control of the rebel States. The necessity for using the currency was almost the same as the necessity to live."

However illegal and contrary to the true interests and policy of the country the conduct of those persons may have been who thus, by military power, forced these notes into general circulation, and however properly any contract made with such persons, founded upon such issues, might be set aside as illegal, that illegality cannot attach to the great mass of non-combatants and peaceful citizens who used them from necessity in the ordinary and lawful transactions of business.

No law of the National government, no act of the re-organized State government of Virginia, no statute of West Virginia ever made it a penal offence to receive or pass these notes, or avoided contracts based upon them, or prohibited their circulation. In the absence then of all statutory provisions inhibiting their circulation, or avoiding contracts based upon them, the validity or illegality of payments made in that currency must be determined by the well established doctrines of the COMMON LAW, and upon the decisions of our highest courts upon cases analogous to the present, and involving the same principles of adjudication.

There are many transactions regarded by the common law as illegal and void as between the parties originally concerned in them, which lose that taint of illegality as they pass into subsequent and collateral undertakings, although the consideration of such subsequent and collateral undertakings may be the same which would have vitiated the original contract. This rule has been adopted for the peace and repose of society. It is analogous in principle to a statute of limitations against misdemeanors. There must be a limit beyond which the vice of the original transaction shall not contaminate subsequent and independent contracts, or affect innocent persons who participate in them.

No case, it is submitted, can be found in English or Amer-

ican adjudication of recognized authority, other than those rendered by this court, where any contract or payment has been declared void, because founded upon the consideration of notes of circulation illegally passed, except as between the original parties to the issue. All contracts made between the illegal banking corporations or individuals issuing such notes have been declared void. But when they passed into general circulation, and were received from hand to hand as currency, all contracts between others than the original parties have been maintained by the courts, or relief has been given upon the general principles of the common law as in other contracts chargeable with fraud, misrepresentation or failure of consideration. No case, it is submitted, can be shown, where such contract was avoided, except as between the offending corporation and its debtors, upon the plea that it was founded on the consideration of notes illegally issued.

In 1815 a large portion of the western section of Virginia was flooded with the notes of unchartered banks to an amount exceeding a million of dollars. For two years they formed the exclusive circulation of a large district of country, and were made the medium of exchange in their business transactions. These notes were issued in direct violation of the statute of the State of Virginia, and were admittedly illegal. There are three cases decided by the court of appeals of Virginia growing out of these transactions, and reported 1 Rand., 76. In all those cases so reported, the point was distinctly taken in the pleadings, and upon which the cases were expected to turn, and did turn, that the banks which made those illegal issues were the real plaintiffs or creditors before the court. "Whatever might be said," says judge Roane, "in relation to an action brought to recover the amount of bank notes, given as the consideration of this bill, in favor of the holder against the bank, it is clear, that no action will lie on a bond given to secure the payment thereof, in favor of the bank, the party more emphatically offending against the policy of the act. It is

this last mentioned party who is now asking the court to give its aid to violate the provisions of great public policy and utility." Roane, p. 99. No intimation is expressed by the court that contracts between other parties, founded upon that illegal currency, would not be maintained as valid. Indeed, Judge Roane draws a distinction between the original parties to the loan. "The person who merely takes the notes of an unchartered bank in payment may not be considered so highly culpable as the institution which issues them; and besides, his necessities may have occluded his freedom of will. And the absence of any question of that sort in transactions so extensive and multifarious in the community is strong, if not conclusive evidence of a general acquiescence in the validity of all contracts founded upon that currency, except where the banks sought to enforce them."

So in *Hamtranck* v. *Selden, Withers & Co.*, 12 Gratt., 29, Judge Allen, in delivering the opinion of the court, says: "By the second plea the consideration of the notes is averred to have been the bank paper of the plaintiff, unlawfully issued by them as currency, thus showing that the contract originated from and the note was obtained by means of bank paper issued by them against law." p. 30.

In the supreme court of the United States, *Orchard* v. *Hughes*, these views are fully sustained by the unanimous judgment of that court. They decide: "It is no defence to a suit for debt, that the debt arose from the receipt of the bills of a bank that was chartered illegally and for fraudulent purposes, and that the bills were void in law and finally proved worthless in fact, the bills themselves having been actually current at the time the defendant received them, and they not having proved worthless in his hands, nor he being bound to take them back from persons to whom he paid them away." 1 Wallace, 73.

The court denies, that the defendant is in a condition upon any common law principle, to raise the question of the illegality of the issue of those notes. The notes were not imposed

upon the defendant by fraud and misrepresentation, nor were they returned upon him in consequence of their worthlessness. He took them freely and without constraint, and passed them to others without loss or abatement. It was no legal wrong to him that these notes were issued illegally by some corporation to some other person; they had proved to him a full and valuable consideration, and he is not allowed to repudiate a contract which was beneficial to him, and from which he sustained no loss or damage whatever.

These principles are not of recent decision, but have been maintained in a variety of forms by the highest courts of England and of this country. In the case of *Armstrong* v. *Toler*, 11 Wheat., 274, Chief Justice Marshall reviewed the English authorities with his usual clearness and ability. He says: " The opinion is, that a new contract, founded on a new consideration, although in relation to property respecting which there had been unlawful transactions between the parties, is not unlawful.

" The contract made with the government for the payment of duties, is a substantive independent contract, entirely distinct from the unlawful importation. The consideration is not infected with the vice of the importation. This would be to connect distinct and independent transactions with each other, and to infuse into one which was perfectly fair and legal, the contaminating matter which infected the other. This would introduce extensive mischief into the ordinary affairs and transactions of life, not compensated by any one accompanying advantage." 270.

"In most of the cases cited by the counsel for the plaintiff in error, the suit has been brought by a party to the original transaction, or on a contract so connected with it, as to be inseparable from it." 274.

Again, in 1816, an association, called the Baltimore Company, was organized in Baltimore for the purpose of furnishing advances and supplies, in fitting out a military expedition under General Mina, against Mexico, then a part of the dominions of the king of Spain. An assignment of a

share in this company, made in 1829 to a *bona fide* purchaser, for a valuable consideration, held valid. Although the transaction was illegal in 1816, and had not changed its character in 1829, yet the assignment was not tainted with any illegality. *McBlair* v. *Gibbes*, 17 How., 232.

In *Brooke* v. *Martin*, 2 Wallace, p. 70, Justice Miller, in delivering the opinion of the court, referred to several cases in 17 Howard, 232, in which the difference between avoiding illegal contracts, and asserting a title to money which has arisen from them, is distinctly taken. And he said the court were satisfied that the doctrine of these cases is sound.

The decision of the supreme court of the United States in the case of *Randon* v. *Toby*, 11 Howard, 520, is a strong confirmation of the principles here contended for. Judge Grier, delivering the opinion of the court, says: "The plea that the notes were given for African negroes imported into Texas after 1833, is equally unavailing as a matter of defence with those already mentioned. It is argued that the notes were void, because the introduction of African negroes was contrary to law. This is no defence in the present case. If these notes have been given on a contract to do a thing forbidden by law, undoubtedly they would be void. But Toby had no connection with the person who introduced these negroes contrary to law. The crime committed by those who introduced the negroes into this country does not attach to all those who may afterwards purchase them. The defendant has enjoyed the negroes and sold them, and received their value. He has, therefore, received full consideration for his notes, nor has he been evicted from their possession. Consequently he has no right to set up a defence under the implied warranty of title, or for want of consideration." 521.

In accordance with these doctrines, the supreme court of the United States has recently, in the case of *Thorrington* v. *Smith & Hartley*, in expressed terms, decided that a contract for the payment of confederate notes made during the late rebellion, between parties residing within the confederate states, may be enforced in the courts of the United

States. The supreme court, in that case, thus says: "It was by this government exercising its power through an immense territory that the confederate notes were issued early in the war, and these notes, in a short time, became almost exclusively the currency of the insurgent States.

"As contracts in themselves, in the contingency of successful revolution, these notes were nullities, for except in that event there could be no payer. They bore, indeed, this character upon their face, for they were made payable only 'after the ratification of a treaty of peace between the confederate states and the United States of America.'

"While the war lasted, however, they had a certain contingent value, and were used as money in nearly all the business transactions of many millions of people. They must be regarded, therefore, as a currency imposed upon the community by irresistible force.

"It seems to follow, as a necessary consequence from the actual supremacy of the insurgent government as belligerent, within the territory where it circulated, and the necessity of civil obedience on the part of all who remained in it, that this currency must be regarded in courts of law in the same light as if it had been issued by a foreign government, temporarily occupying a part of the territory of the United States.

"Contracts stipulating for payments in that currency cannot be regarded as made in aid of the foreign invasion in the one case, or of the domestic insurrection in the other. They have no necessary relation to the hostile government, whether invading or insurgent. They are transactions in the ordinary course of civil society, and, though they may indirectly and remotely promote the ends of the unlawful government, are without blame except when proved to have been entered into with actual intent to further the invasion or insurrection.

"We cannot doubt that such contracts should be enforced in the courts of the United States, after the restoration of peace, to the extent of their just obligation."

But it is not essential to the success of the appellee in the present case that the doctrines above set forth shall be sustained by this court. Her defense is complete under the decisions already announced. The validity of transactions in confederate money first came under the notice of the court in the case of *Brown and others* v. *Wylie*, 2 W. V. Rep., 503. Wylie sold a tract of land to Brown, received seven thousand dollars of confederate money in hand, executed his deeds for the land sold, and took two bonds and a deed of trust to secure the residue of the purchase money payable in confederate notes. Held by the court, that the sale of the land by Wylie to Brown to be paid for in confederate notes was illegal, but nevertheless an executed contract, which transferred the title from the vendor to the vendee, and refused to lend its aid to the vendor to recover back the money received, or the land so conveyed away. It also refused to enforce payment of the deferred bonds and trust deed, or at the instance of Wylie to have them cancelled. It left the parties to rest in the condition in which they had placed themselves.

The doctrine, therefore, clearly deducible from this case is, that whenever a contract in confederate currency has been executed between the parties, it will leave them to rest in the condition in which they have placed themselves.

An executed contract is one in which the object of the contract is performed. Ch. Justice Marshall, 6 Cranch, 136. A contract for the payment of money is executed when the creditor voluntarily accepts from the debtor what he regards as satisfaction in full of the debt, and executes to him a receipt in full against it. A partial payment is *pro tanto* an executed contract, for while the creditor is not bound to receive less than the whole amount due to him, yet when he does voluntarily receive less, and testifies his assent to the partial payment by a receipt, or an endorsement of a credit on the contract, it is to that extent an executed contract.

In this case, the appellant voluntarily receives payment in full of the bond, partly in wheat and partly in confede-

rate notes, and executes his receipt in full against the bond. But the appellant not merely executed a receipt in full of the bond, but also subsequently executed a release in full of the debt, giving the most absolute finality to the transaction.

"A release by deed at once destroys and annuls the pre-existing claim or obligation, operating *proprio vigore* as a direct discharge, totally independent of extrinsic circumstances." Coke on Lit., 212; Addison on Contracts, 2. A creditor who has given a receipt not under seal, is nevertheless permitted to prove that he has not received the money; but it is otherwise if the receipt be by deed, for the law admits no evidence to the contrary. Such is the nature of what we call an *estoppel.* 3 B. & Ald., 313, E. C. L. R., vol. 23; *Shattan* v. *Rupell,* 2 T. R., 366; 2 B. & Ald., 544; Smith on Contracts, 73.

The subsequent possession acquired by the appellant of the bond thus paid in full and released, and his improper retention and use of it, characterized as his conduct was by breach of agency and violation of trust, can place him in no better situation than if the bond had been delivered by him to the appellee at the time of its payment in full.

The instruction of the circuit court was in accordance with the principles announced by this court in the case of *Brown* v. *Wylie,* 2 W. V. Rep., and the verdict of the jury found that the bond had been so paid and discharged as that the defendant was then entitled of right to said bond. In other words, they found the fact that the defendant had fully executed her contract with the plaintiff.

BROWN, *President.*

This was an action of debt on a bond, for the payment of money to which there were two pleas, viz: payment, and a special plea of release. The facts proved showed the debt paid partly in lawful money, partly in wheat at a stipulated price, partly in orders on the treasurer of the confederate states, so-called, and the residue in confederate money,

which payments were accepted and received as such in full of said bond; but the bond not being in the possession of the plaintiff, to be surrendered up, he then agreed and undertook to procure and deliver it to the defendant, and thereupon gave to the defendant a receipt in full of the balance on said bond so paid, and also a release of the trust deed given to secure the bond. The jury found a verdict for the defendant, which was set aside on motion of the plaintiff, and a new trial granted, and a second trial had, and a second verdict found for the defendant. The plaintiff again moved the court to set aside the second verdict, which the court refused. No objection was raised to the admissibility of the evidence under the pleadings; but it is objected that a payment in orders on the treasurer of the confederate states, so-called, and in confederate money, is illegal and void. It was as illegal to receive as to pay in a currency which was illegal, because against public policy; and the courts will no more aid the one party than the other. The payment was fair between the parties, without fraud or misrepresentation; both understood what they were about, with full knowledge of the article paid and received in payment.

An executed contract is one in which the object of the contract is performed. Marshall, C. J., 6 Cranch, 136. A debt paid is a contract executed; and an executed contract, even though illegal, will not be disturbed between the parties to it. *Wylie* v. *Brown*, 2 W. Va. Rep., 503.

Again, a formal release was pleaded, and though the release, as pleaded, is not offered in evidence, or at least not made part of the record in the bill of exceptions, yet it is certified as in proof, without objection, that upon the payment of the debt as above stated, the plaintiff not having the note in his possession, gave his receipt in full for the balance on the bond, and undertook to obtain the bond and deliver it to the defendant. Parol evidence was also given, without objection, of the execution of a release of the deed of trust by which the bond was secured. There is nothing to show

that the release as pleaded was not the same referred to in the evidence, and if not produced, yet its contents were proved, without objection, substantially.

In refusing the instruction as asked by the plaintiff, and in giving the instruction which the court did give, there was no error to the prejudice of the plaintiff, or of which he could complain.

I think, therefore, that the judgment of the court below should be affirmed, with costs and damages to the defendant in error.

The remaining members of the court concurred.

JUDGMENT AFFIRMED.